Whitney E. Street (State Bar No. 223870)
Lesley E. Weaver (State Bar No. 191305)
BLOCK & LEVITON LLP
520 Third Street, Suite 108
Oakland, CA 94607
(415) 968-8999
(617) 507-6020
wstreet@blockesq.com
lweaver@blockes.com

*Attorneys for Plaintiffs*

[Additional counsel on signature page]

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Lax & Company, Inc. and Howard Robinson, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> American Airlines Group Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., United Continental Holdings, Inc., and United Airlines, Inc., <br><br> Defendants. | Case No. _____ <br><br><br> **CLASS ACTION COMPLAINT** |

**CLASS ACTION COMPLAINT**

Plaintiffs Lax & Company, Inc. and Howard Robinson, by and through their attorneys, on behalf of themselves and all others similarly situated, bring this Class Action Complaint ("Complaint") against American Airlines Group Inc., American Airlines, Inc. (together, "American"); Delta Air Lines, Inc. ("Delta"), Southwest Airlines Co. ("Southwest"); United Continental Holdings, Inc. and United Airlines, Inc. (together, "United") (collectively "Defendants") and allege, based upon personal knowledge, information, belief, and the investigation of counsel, as follows:

## NATURE OF THE ACTION

1.      This lawsuit is a proposed class action to recover damages and other appropriate relief based on Defendants' unlawful conspiracy, from at least July 14, 2011 to the present, to fix, raise, maintain and stabilize the price of domestic airline tickets. As set forth below, Defendants' conspiracy violates Section 1 of the Sherman Act of 1890, 15 U.S.C. § 1 ("Sherman Act").

## INTRODUCTION

2.      From at least July 14, 2011 to the present, Defendants conspired to artificially inflate the price of domestic airfare, including by restricting capacity and engaging in conduct that limited price transparency to consumers seeking to purchase domestic airline tickets.

3.      The airline industry is susceptible to collusion due to the fact that it is controlled by a very small number of carriers. Recent major mergers have left the market with only four major players: American, Delta, Southwest and United. Together, these four carriers control over 80% of domestic flights. These mergers and the resultant market concentration have allowed Defendants to stifle competition in the airline market to the detriment of the consuming public.

4.      Specifically, Defendants agreed to restrict and control capacity – a practice that industry executives have referred to as "capacity discipline." As detailed herein, Defendants communicated with one another regarding any plans to add or restrict capacity and coordinated to control and monitor capacity in an effort to maintain domestic airline ticket prices at supracompetitive levels.

5.      Defendants have publicly scorned proposed announced capacity additions, resulting in withdrawal or modification of such capacity additions, evidencing that Defendants are able to effectively monitor and police their cartel.

6.      In addition to strict capacity restrictions, Defendants coordinated to minimize pricing transparency to the detriment of consumers who thus overpaid for domestic airline tickets.

7.      Prices for domestic airline tickets therefore were, and continue to be, artificially inflated. Moreover, as discussed herein, that prices continued to rise while the price of jet fuel plummeted further demonstrates that Defendants conspired to fix, raise, maintain, or stabilize the price of domestic airline tickets.

CLASS ACTION COMPLAINT

8.     As a result of Defendants' illegal conduct in restraint of competition, consumers, including Plaintiffs and all members of the proposed Class, have been forced to pay supracompetitive prices for domestic airline tickets and thus have been harmed by Defendants' conduct.

## CLASS ALLEGATIONS

9.     Plaintiffs bring this class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class of plaintiffs (the "Nationwide Class" or "Class") consisting of:

> All persons and entities who purchased domestic airline tickets directly from one or more Defendants from at least July 14, 2011 to the present (the "Class Period"). Excluded from the Class are governmental entities, Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and any judges or justices assigned to hear any aspect of this action.

10.     The class is so numerous that joinder of all members is impracticable. On information and belief, thousands of individuals and entities purchased airfare from the Defendants during the Relevant Period.

11.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all Class members share the same injury, as they were all damaged by the actions of Defendants which caused them to pay artificially inflated prices for airline tickets.

12.     Plaintiffs will fairly and adequately represent and protect the interests of the Class members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class members.

13.     Plaintiffs are represented by counsel who are experienced and respected in the prosecution of class action and antitrust litigation.

14.     This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class, such as:

a.   Whether the Defendants engaged in a conspiracy to raise, fix, and maintain prices of domestic airline tickets sold in the United States through, *inter alia,* coordinated capacity restrictions;

b.   The duration and extent of the conspiracy;

c.   Whether each Defendant was a participant in any such conspiracy;

d.  Whether the actions of Defendants in so conspiring violated Section 1 of the Sherman Act;

e.  Whether the conspiracy had the effect of artificially inflating the price of airline tickets sold in the United States during the Relevant Period;

f.  Whether the conduct of the Defendants caused injury to Class Members; and

g.  The measure and amount of damages incurred by the Class.

15.     Adjudicating the claims of the Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this action to obtain injunctive relief and treble damages, as well as reasonable attorneys' fees and costs, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

17.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because one or more Defendants reside in this district, all of the Defendants transact business in this district, and a substantial portion of the affected interstate trade and commerce was carried out in this district.

18.     Defendants are subject to the personal jurisdiction of this Court by virtue of their nationwide contacts and other activities, including because (1) each Defendant transacted business in this District; (2) each Defendant directly or indirectly sold and delivered domestic passenger air transportation in this District; (3) each Defendant has substantial contacts with this District; and (3) each Defendant engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed

at, and had the intended effect of causing injury to, persons and entities residing in, locating in, or doing business in this District.

**INTRADISTRICT ASSIGNMENT**

19.     Intradistrict assignment to the San Francisco Division is appropriate. The practices at issue adversely affect air passengers who reside in that division and paid airfares and other ancillary fees to Defendants. Other antitrust class actions involving claims of fare and/or fuel surcharge price-fixing by airlines have previously been filed in the San Francisco Division and were or are being presided over by the Honorable Charles R. Breyer. *See In re Transpacific Passenger Air Transportation Antitrust Litig.*, MDL No. 1913, No. 07-CV-5634-CRB (N.D. Cal.); *In re International Air Transportation Surcharge Antitrust Litig.*, MDL No. 1793, No. M 06-1793-CRB (N.D. Cal.).

20.     Additionally, on July 13, 2015, three cases alleging substantially identical claims were related to *In re Transpacific Passenger Air Transportation Antitrust Litig.*, MDL No. 1913, No. 07-CV-5634-CRB (N.D. Cal.). Those cases are: *Lavin v. American Airlines, Inc., et al.*, No. 3:15-CV-03090 (N.D. Cal.); *Backus v. Delta Air Lines, Inc.*, No. 3:15-CV-03137 (N.D. Cal.); and *Andrade v. American Airlines Group Inc.*, No. 3:15-CV-03111 (N.D. Cal.).

**PARTIES**

21.     Plaintiff Lax & Company, Inc. is a Rhode Island corporation with its principal place of business in Warwick, Rhode Island. Lax & Company provides financial planning services to individuals, including doctors, professionals and small business owners. It specializes in life and disability income insurance, long term care insurance, advanced uses of life insurance, employee benefit programs, retirement plans, business insurance, wealth accumulation and estate planning. During the Class Period, Plaintiff Lax & Company purchased air passenger transportation services directly from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

22.     Plaintiff Howard Robinson is a resident of Sharon, Massachusetts.  During the Class Period, Plaintiff Robinson purchased air passenger transportation services directly from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violation alleged herein.

**American Airlines**

23.     Defendant American Airlines Group Inc. is a holding company and the parent company of Defendant American Airlines, Inc. Both American Airlines Group Inc. and American Airlines, Inc. (together, "American") are Delaware corporations with their principal places of business located in Fort Worth, Texas.

24.     American was formed in December 2013 as a result of the merger of AMR Corporation, the previous parent company of American Airlines, and US Airways Group, the previous parent company of US Airways. The new American (consisting of American, American Eagle, US Airways and US Airways Express) is the largest airline in the world, operating nearly 6,700 flights per day to 339 destinations in 54 countries.

**Delta**

25.     Defendant Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its principal place of business located in Atlanta, Georgia. Delta operates more than 5,400 flights per day to 326 locations in 64 countries.

**Southwest**

26.     Defendant Southwest Airlines Co. ("Southwest") is a Texas corporation with its principal place of business located in Dallas, Texas. Southwest carries the most domestic passengers of any U.S. airline. It operates more than 3,600 flights per day to 94 locations in the United States and six additional countries.

**United**

27.     Defendant United Continental Holdings, Inc. is a holding company and the parent company of Defendant United Airlines, Inc. Both United Continental Holdings, Inc. and United Airlines, Inc. (together, "United") are Delaware corporations with their principal places of business located in Chicago, Illinois. United operates more than 5,300 flights per day to 369 locations.

28.     The acts taken by Defendants, as alleged herein, were authorized, ordered and condoned by their respective parent companies and authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

CLASS ACTION COMPLAINT

29.     Various other persons, corporations, or firms not named as Defendants herein may have participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

## INTERSTATE TRADE AND COMMERCE

30.     Defendants' conduct, as described in this Complaint, were within the flow of, were intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

31.     During the Class Period, Defendants sold airline tickets and provided airline travel services in a continuous and uninterrupted flow of interstate commerce throughout the United States and its territories. The price-fixing conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTUAL ALLEGATIONS

### A. **Domestic Passenger Air Travel**

32.     Domestic passenger air travel is a homogenous service sold by airlines, including Defendants, to their customers, including Plaintiffs and the members of the Class, primarily based on price. Domestic passenger air travel is a commodity product that is fungible because domestic air travel service provided by one airline is readily substitutable for any domestic air travel service provided by any other airline.

### B. **The Industry**

33.     In 1978, Congress passed the Airline Deregulation Act ("ADA"), which freed the domestic airline industry from government regulation. Specifically, the ADA turned over control of fares, routes, and market entry of new airlines from the government to the market. Thus, free market forces should operate in the airline industry. However, market forces fail to explain the recent trend of increasing domestic passenger airfares.

34.     Defendants' ability to coordinate prices and capacity has become easier in recent years. Since 2005, the domestic airline industry has experienced significant consolidation, as discussed *infra* Section D. The resultant market is dominated by only four major airlines that together control over 80% of the market, making the structure of the industry susceptible to coordinated conduct.

35.     As detailed herein, Defendants interact with one another through a variety of channels, which facilitate their collusion. For example, Defendants are members of trade associations, including *inter alia* Airlines for America ("A4A") and the International Air Transport Association ("IATA").[1] Moreover, Defendants communicate directly with one another regarding competitive issues, including pricing, and also use financial analysts as conduits through which they pass information to one another.

36.     Defendants' pricing behavior, as discussed herein, has been inconsistent with a competitive market.

### C.   The Conspiracy

#### a.   Capacity Restrictions

37.     In a collusive effort to raise prices and reap unprecedented profits, Defendants agreed to exercise capacity discipline. A June 11, 2015 *New York Times* article by James B. Stewart explained that "'[d]iscipline' is classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins. This year, that discipline seems to be working: the I.A.T.A. projected this week that airline industry profits would more than double this year to nearly $30 billion, a record." The same article noted: "When airline industry leaders say they're going to be 'disciplined,' they mean they don't want anyone to expand capacity."

38.     This discipline has led to increasing profit margins for Defendants. For example, American reported net income excluding net special charges of $4.2 billion in 2014 – up 115% from the prior year. United reported net income of $1.132 billion in 2014 – up from $571 million in 2013. Similarly, Delta's January 20, 2015 announcement of its December 2014 quarter financial results reported "a 70 percent increase in profits." Southwest also reported increased income in 2014, stating in its 2014 Annual Report to Shareholders, "Our 2014 net income of $1.1 billion easily surpassed the previous annual record in 2013."

39.     Although, as IATA has reported, there is "strong demand growth" for domestic passenger air travel, airlines have refused to meet the demand with increased capacity, driving up the prices of domestic airline tickets.

---

[1] A4A is a trade organization of leading U.S. passenger and cargo carriers. Its members transport more than 90 percent of all airline passengers and cargo within the United States.
The IATA is an international trade association representing over 240 domestic and international airlines.

CLASS ACTION COMPLAINT



40.     Capacity reductions can be tied to recent consolidation within the industry. As detailed herein, the market is highly concentrated with, at present, only four major carriers that control 80% of the market. As the DOJ has explained, significant mergers in the industry have been followed by capacity reductions: "[t]hese capacity reductions have not consisted simply of cancellation of empty planes or empty seats; rather, when airlines have cut capacity after a merger, the number of passengers they carry on the affected routes also decreased."

41.     As reported by the *New York Times*, Dr. Fiona Scott Morton said that "'on most airline routes, consumers have very little choice.' She noted that only since the recent wave of consolidation among airlines have they been able to set prices significantly above marginal cost. 'That's great for the industry but not for consumers....'"

42.     A single airline does not have an independent interest to have capacity discipline. If a single airline limited its capacity and raised its prices, its customers would simply turn to another airline. Thus, the "disciplined" airline would lose market share and sustain losses. However, if the four major airlines (which, together, control 80% of the domestic passenger air travel market) coordinate to engage in capacity discipline and increase prices, consumers will be forced to either pay the higher prices or possibly forego air travel altogether.

43.     As previously noted, one airline would not choose to exercise capacity discipline absent assurances from others that they too would choose to be disciplined. In order to exchange such assurances, Defendants often communicated to one another their intention to remain disciplined.

44.     For example, when discussing United's 2014 $2 billion in profits, United's then-CEO, Jeff Smisek, said "[w]e will absolutely not lose our capacity discipline.... It's very healthy for us and very healthy for the industry."  Mr. Smisek resigned as United's chairman, president and CEO on September 8, 2015, effectively immediately, as did the company's executive vice president of communications and government affairs and its senior vice president of corporate and government affairs.  The Company has publicly reported that the resignations were related to a corruption investigation involving adding flights in exchange for the Port Authority of New Jersey's approval of and funding for certain projects, including a $600 million extension of a PATH train. Former CEO Smisek was reportedly personally involved in such negotiations.  Bloomberg News has reported that "there may have been a direct link" between such requests that "raise the possibility of bribery or extortion."

45.     With respect to "capacity discipline," Delta's CEO, Richard Anderson, delivered a similar message: "As we begin 2015, we have a significant opportunity from lower fuel prices, which will drive more than $2 billion in fuel savings over 2014. Through our capacity discipline, pricing our product to demand, and the fuel savings, we expect to drive double-digit earnings growth, along with increased free cash flow and a higher return on invested capital in the upcoming year." Anderson also added that "[w]e are not making any changes to our 2015 capacity plan in light of the lower fuel prices. In fact, we continue to trim capacity on the margin to maintain yields...."

46.     In support of the cartel, American rolled back a previously announced pre-merger plan to add both domestic and international routes. In March 2015, Scott Kirby (American's President) confirmed at an investor conference that American would not be following the previously announced plan to add domestic and international routes. Specifically, Kirby said that "[a]lmost all of our capacity growth domestically is about putting more seats on airplanes," not adding airplanes. Kirby explained:

> It's distinct from capacity where we're adding new airplanes, growth aircraft. We really aren't. We expect to end 2015 with fewer aircraft at the end of the year than we started the year, but we'll still have capacity growth because we have more seats on each of the aircraft....All airlines for the most part are putting more seats on airplanes. We're doing it.

United's doing it. Delta's doing it. Even Southwest is continuing to put more seats on their existing aircraft. Once you've done that, you're done.

47.    Due to growing demand (as reported by IATA), adding a limited number of seats allows Defendants to continue to fill existing aircraft at higher prices without having to incur the expense (including additional fuel, crews, gates, etc.) of adding new aircraft.

48.    In order to maintain the cartel, Defendants monitored one another and policed their shared commitment to capacity discipline. One recent example of such monitoring and policing involved Southwest's announcement of a planned capacity expansion, followed shortly by its recantation. On May 20, 2015, Gary C. Kelly, the CEO of Defendant Southwest, announced that Southwest would increase its capacity by as much as eight percent by acquiring two new gates at its hub at Love Field in Dallas, TX.

49.    As a result of Southwest's announcement, the stock prices of the other Defendant airlines plummeted. Industry stock analysts, including one from Raymond James, explained that investors were reacting to the perceived "end of the era of capacity discipline."

50.    The industry's reaction to this announced break in "capacity discipline" was swift and direct. At the June 7-9, 2015 IATA Annual General Meeting held in Miami, Florida, several industry executives in attendance voiced the continued need for the industry to remain disciplined with respect to capacity growth. For example, Ed Bastian (Delta's President), said that Delta is "continuing with the discipline that the marketplace is expecting." Douglas Parker (American's CEO) echoed those remarks, stating that the airlines had learned their lessons from past costly capacity additions: "I think everyone in the industry understands that."

51.    Southwest heard the messages of its competitors and responded accordingly. Within a matter of days, Southwest had relented to the pressure and fallen in line. The June 11, 2015 *New York Times* article by James B. Stewart explained that "after coming under fire at this week's conference, Southwest quickly moved to reassure investors it isn't going rogue," announcing "'[w]e have taken steps this week to begin pulling down our second half of 2015 to manage our 2015 capacity growth....'" Thus, it is clear that Defendants actively monitor and police the cartel.

52.    On June 17, 2015, United States Senator Richard Blumenthal ("Senator Blumenthal") wrote a letter to United States Assistant Attorney General William Baer, encouraging an investigation

into the industry's actions. With respect to Southwest's revisions to its announced plan to increase capacity, Senator Blumenthal stated that "[t]he conclusion seems inescapable that the remarks made at the IATA conference were targeted at Southwest, and that its capitulation was the result of the 'fire' aimed at the company."

53.    Senator Blumenthal wrote:

Recently, the International Air Transport Association (IATA) brought together the top executives of the world's largest airlines at its annual meeting in Miami, Florida. The New York Times reported that at this meeting many of these competitors publicly discussed their strategies to remain "disciplined" in their decisions to manage capacity across their flight routes.[] As you know from the Department of Justice's (DOJ's) investigation into US Airways' merger with American Airlines in 2013, most airlines have traditionally viewed capacity reductions as a highly valuable way to artificially raise fares and boost profit margins. In light of the recent unprecedented level of consolidation in the airline industry, this public display of strategic coordination is highly troubling.

Therefore, I urge the Justice Department to investigate this apparent anti-competitive conduct potentially reflecting a misuse of market power, and excessive consolidation in the airline industry. DOJ itself played a part in this consolidation by approving several mergers and now consumers are paying sky-high fares as airlines engage in market conduct designed to keep capacity artificially low.

***

In August 2013, the Justice Department filed an antitrust lawsuit to block the proposed merger between US Airways and American Airlines.[] A few months later, DOJ settled that case and allowed the merger to proceed subject to a number of gate divestitures. As a result of that merger, just four major airlines now account for eighty percent of all domestic air travel.

DOJ's original complaint painted a stark picture of an extremely consolidated market, in which few firms wield enormous market power to the detriment of consumers and competition – and in which high-level executive [sic] believe there is an unmistakable link between fluctuations in capacity and fares [sic] hikes. During the course of the Antitrust Division's review of the American Airlines / US Airways merger, your staff studied the internal analyses and the planning documents put together by both companies in considering the likely effects of the merger. During DOJ's original announcement rejecting the merger you stated, "High level executives at US Airways have talked about how consolidation allows for capacity reductions that 'enable' fare increases."[]

In particular, DOJ's complaint provided evidence of past behavior by US Airways to punish a rival for its reducing fares; it also alleged that the merger would reduce capacity and growth across the industry; and result in increased coordinated interaction among the remaining legacy airlines.

The Complaint specifically documents the troubling history of US Airways communicating directly to a rival airline that it was upset by that airline's efforts to compete more aggressively. In 2010, senior executives at US Airways complained that competition from the rival airline was "hurting profitability" in the industry. DOJ wrote: "[S]enior management debated over email about how best to get the rival airline's attention and bring it back in line with the rest of the industry. . . .[The CEO] urged the other executives to, 'portray these guys as idiots to Wall Street and anyone who'll listen.'"[]

The Justice Department also correctly predicted that this kind of behavior would continue should the merger be allowed to proceed – as it ultimately was. In the original complaint, DOJ wrote, "The structure of the airline industry is already conducive to coordinated behavior...the legacy airlines closely watch the pricing moves of their competitors. When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."[]

To bring home the point, the Complaint follows, "Coordination becomes easier as the number of major airlines dwindles and their business models converge."[]

I agree. I therefore urge the Antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by recent pricing patterns as well as remarks made at the IATA conference. Consumers are paying sky-high fares and are trapped in an uncompetitive market with a history of collusive behavior. If you find that these comments were coordinated to punish Southwest Airlines' announcement of capacity increases, I urge you to use all the tools at your disposal to punish this anti-competitive and anti-consumer behavior.

54.     On June 30, 2015, the DOJ launched an investigation, sending civil investigative demands ("CIDs") to Defendants. A spokesperson for DOJ, Emily Pierce, confirmed the DOJ's investigation, saying the Department was investigating "possible unlawful coordination" to limit capacity increases and raise, fix, stabilize, or maintain prices. The Defendants confirmed receipt of the DOJ's CIDs.

55.     The Associated Press obtained a copy of the CID. Specifically, the Associated Press reported:

We have a copy of the "civil investigative demand for documents and information" that seeks this type of information:

- Tell us who in your company sets the communications strategy to shareholders, investors or analysts and who does that communication.

- Give us any documents "discuss[ing] (a) the need for, or the desirability of, capacity reductions or growth limitations by the company or any other airline; or (b) the undesirability of your company or any other airline increasing capacity."

- Give us any documents that talk about changes in your capacity or that of your competitors.

- Give us any communications between you and outside parties about your capacity or that of your competitors and how capacity changes affect fares, revenues or profits.

- Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have involving industry analysts (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts).

- We want to know everybody who owns at least 2 percent of your company, including the time that person owned that much of your company.

- Concerning those people who owned at least 2 percent, tell us about all your meetings, appointments or conference with those people in which industry capacity was discussed. We want to see any calendars, appointment books, day planners, etc., that were involved, as well as any documents prepared for those discussions and which talked about those discussions afterward.

- We want to know how much capacity you flew, in available seat miles, every month since January 2010, and please include the seat miles flown by your regional partners as well.

- Spell out your document retention policy including emails.

- Tell us who is preparing this information and submitting it to us. If someone gives that preparer some oral instructions, tell us who gave the oral instructions and what he and she said.

56.     On the following day, George Jepsen, the Attorney General of the State of Connecticut, announced his office's investigation into collusive activity in the domestic airline industry. Jepsen also announced that his office had sent letters to American, Delta, Southwest and United.

57.     The Business Travelers Coalition ("BTC") also applauded the initiation of the DOJ investigation. As reported in a July 2, 2015 article in eTurbonews:

"The number one concern that antitrust experts have – with no close second – as with regard to radical consolidation of any industry, is the risk of tacit competitor coordination on policies, practices and prices among a reduced number of industry participants," stated BTC chairman Kevin Mitchell. "Since recent U.S. airline mega-mergers, we have witnessed near constant airline CEO calls for 'capacity discipline' during industry gatherings and analyst earnings calls only to be echoed by analysts in follow-on earning calls with other airlines. This represents perhaps the darkest hours of airline coordination as well as a too-cozy harmonization between airlines and Wall Street," added Mitchell.

58.     In response to the DOJ's action, Senator Blumenthal encouraged it to "be tireless and timely to save consumers from the onslaught of price increases in summer fares that may result from collusive and anticompetitive airline company misconduct."

59.     United States Senator Charles E. Schumer ("Senator Schumer") also praised the DOJ's response, stating that "[i]t's hard to understand, with jet fuel prices dropping by 40 percent since last year, why ticket prices haven't followed. We know when airlines merge, there's less price competition."

**b.  <u>High Airline Ticket Prices Are Not Explained By Market Forces</u>**

60.     The market trend of increasing airline ticket prices is not explained by market forces. For example, during the time that airfares were steadily climbing, the cost of jet fuel was falling dramatically.



61.     As Senator Schumer explained in December 2014, "when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity....The industry often raises prices in a flash when oil prices spike, yet they appear not to be

---

adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather....”

### c. The Airlines Coordinate to Decrease Price Transparency for Consumers

62.     In addition to coordinating to limit capacity, Defendants also coordinate to limit price transparency to the detriment of the American consumer. An article by the BTC noted that, in addition to the airlines’ “tacit coordination on capacity,” the airlines engaged in an “even more aggressive and widely coordinated attack on price transparency, consumer protections and competition.” Specifically, as noted by the BTC:

ANCILLARY FEE DATA

Since 2008, the Big Three U.S. airlines (Delta Air Lines, American Airlines, United Airlines) have rejected their most valued corporate customers’ demands for ancillary fee data that would enable their business travelers to efficiently see, compare and buy ancillary services (e.g., checked bags, preferred seats) in the same transaction as the base airfare. Leisure travelers must navigate airline websites in search of best airfare and ancillary fee combinations often paying higher prices than necessary. In total, this opacity results in these ancillary fees not being disciplined by market forces. Likewise, there is great profit in consumer confusion.

PASSENGER FACILITY FEES

Airports use PFC’s to add gates and other facilities to attract additional airlines to compete for local travelers’ business expanding consumer choice and disciplining incumbent airlines’ prices. The Big Three seem to not want new competition.

****

NORWEGIAN AIR INTERNATIONAL’S (NAI) APPLICATION

Under the EU-US Open Skies agreement, NAI’s application to serve the U.S. should have been a 5-week pro forma review and approval. Instead, airlines’ political pressure has held up approval for 15 months. This is as embarrassing to the United States as it is outrageous in its harm to U.S. consumers. Airlines fear that if NAI’s low-fare business model were to be embraced by U.S. consumers, other carriers like Ryanair and JetBlue would seek to emulate NAI’s success.

U.S. DOT CONSUMER PROTECTION AUTHORITY

The Big Three fought the Full Fare Advertising Rule promulgated in 2011 by DOT. When DOT implemented the rule to safeguard consumers’ interest, the airlines sued DOT in federal district court and lost. They then went to the Supreme Court, which rejected their pleas. Airlines finally turned to the U.S. House of Representatives to pass the Orwellian named Transparent Airfares Act of 2014. The bill, luckily rejected by the Senate, would

have increased airlines' revenues and profits by obscuring the true price of air travel options.

PROTECTION FROM GULF CARRIER COMPETITION

The Big Three claim that the Gulf airlines – Emirates, Qatar and Etihad – receive government support that is harming the U.S. carriers. The Big Three co opted Congress again with a Congressional letter that supports the Big Three's call for a freeze in new air services by the Gulf airlines – all without having allowed those carriers an opportunity to respond to the allegations, not to mention the glaring hypocrisy that the U.S. airline industry, by the Big Three's very own math, has been the most heavily taxpayer subsidized and structurally advantaged in the history of commercial aviation. Brazenly, the airlines recently warned the Obama Administration that if they don't play ball, the Big Three will again seek Congressional legislative support.

63.    Like the BTC, the Travel Technology Association has voiced its concerns over Defendants' efforts to limit transparency. On May 19, 2015, it issued "Benefits of Preserving Consumers' Ability to Compare Airline Fares," a report prepared by Charles River Associates for the Travel Technology Association and authored by, among others, Dr. Fiona Scott Morton. The report explained that competition in the domestic airline industry had suffered because of the significant number of mergers of legacy carriers and efforts by the major airlines to discourage travelers from using online travel agencies ("OTAs") that make it easy for prospective travelers to compare fares of various airlines.

64.    The report found that:

- Restrictions by airlines of broad access to airline information – prices and schedules – substantially reduce consumer welfare. This study estimates the potential reduction in net consumer welfare of limiting airline price and schedule information to only airline websites could exceed $6 billion per year. Additionally, such restrictions may result in up to 41 million passengers annually choosing not to fly.

- In addition to offering independent price comparisons, OTAs and metasearch travel sites provide consumers with other travel information, such as suggestions for places to go and things to do. Supplementing airline schedule information with complementary information and products expands the market for air travel, further increasing consumer welfare.

- Airline markets are highly concentrated, with significant barriers to entry. The recent merger of American Airlines and US Airways has led to fare increases in affected city-pair markets that are about 4 percent higher than in non-affected markets. In certain city-pair markets in which the merger reduced the number of

significant competitors from 3 to 2, or from 2 to 1, fare increases have been 7 to 17 percent. The welfare-enhancing impacts of broad access to airline fare and schedule information may be even larger in duopoly or monopoly city pairs.

- Airline profits globally are at an all-time high, expected to reach $25 billion for 2015.[] While airline fuel prices declined nearly 25 percent last year, average domestic airfares have remained flat while ancillary revenue of the major U.S. airlines grew to over $15 billion in 2014.[]

65. The report also detailed certain Defendants' efforts to stifle metasearch sites, including:

- Prohibiting metasearch sites from referring consumers to an OTA for booking a flight.

- Prohibiting OTAs from providing airline information to metasearch sites.

- Prohibiting GDSs from providing airline price and schedule information to "unauthorized" metasearch sites.

- Prohibiting onward-distributing flight schedule information to metasearch sites by services such as Innovata.[]

- Refusing to pay metasearch sites for direct referrals to the airline's own booking website.

- Prohibiting metasearch sites from displaying price information of the airline.

66. The report estimated that airlines earn approximately $30 more on each leisure and unmanaged business passenger when prices are not transparent.

**D. Market Characteristics Conducive to Collusion**

    **a. The Airline Market is Susceptible to Collusion because it is Controlled by a Limited Number of Participants**

67. The domestic airline industry is highly concentrated. In 2008, there were eight major carriers in the United States. Today, due to a series of mergers, there are just four. Together, Defendants control more than 80% of the market for domestic airline seats.

68. Specifically, in 2005 US Airways merged with America West. In 2008, Delta merged with Northwest Airlines. In 2010, United merged with Continental. In 2011, Southwest merged with AirTran. Finally, in 2013, American merged with US Airways. The American- US Airways merger resulted in the creation of the largest airline in the world.

CLASS ACTION COMPLAINT

69.   The DOJ initially opposed the merger of American and US Airways, filing an antitrust lawsuit against the two companies in August 2013. The DOJ's complaint ("2013 DOJ Complaint") explained that the heavily consolidated market – which, at that time, was dominated by five major airlines (American, Delta, Southwest, US Airways and United) – allowed these airlines to use their market power to coordinate limitations on capacity while increasing airfares.

70.   The DOJ explained that the "structure of the airline industry is already conducive to coordinated behavior: Few large players dominate the industry; each transaction is small; and most pricing is readily transparent." 2013 DOJ Complaint at ¶ 41. Further market consolidation (*i.e.*, from the 5 dominant airlines that controlled the market then to the 4 dominant airlines that control the market now) "would [thus] make it easier for the remaining airlines to cooperate, rather than compete, on price and service." *Id.* at ¶ 3.

71.   In its complaint, the DOJ outlined examples of such coordinated behavior. These behaviors include: (1) competitors closely watching and copying each other's pricing increases; (2) using "cross-market initiatives," where one airline attempts to discourage discounting by its competitor by responding to the competitor's discount with its own discount in another market in which the competitor prefers a higher fare; and (3) direct communications between competitors designed to discourage or punish airlines that cause price wars. *Id.* at ¶¶ 42-45.

72.   The DOJ reached a settlement with American and US Airways that allowed the two airlines to merge. As part of the settlement, the airlines were forced to divest certain gates and slots at major airports in Washington D.C., New York, Los Angeles, Chicago, Boston, Dallas, and Miami.

73.   Increased consolidation – resulting in 80% of the market being controlled by only 4 airlines – has harmed airline passengers. As a result of this consolidation, coordination between the remaining carriers has become easier and Defendants have taken advantage of the opportunity to coordinate to set higher fares, impose new and higher fees on travelers, and reduce their capacity.

74.   Defendants' power to impose exorbitant prices on American consumers is also evidenced by a Department of Transportation investigation, announced July 24, 2015, regarding allegations that Defendants engaged in price gouging immediately following the deadly May 2015 Amtrak derailment in Philadelphia.

**b. High Barriers to Entry in the Airline Market Make the Industry Susceptible to Collusion**

75.     There exist substantial barriers to entry in the market for domestic airline passenger service. Thus, new market entrants are unlikely to disrupt the stranglehold over the market possessed by Defendants.

76.     Barriers to entry include that the airline business is very capital-intensive. New market entrants would have to acquire *inter alia* airplanes, gates and runway slots. Moreover, the industry has historically suffered from lack of profitability.

77.     New market entrants are also discouraged by high market concentration, *i.e.* that the market is dominated by a small number of carriers. The industry consolidation discussed above has allowed the dominant carriers to control a high percentage of the gates and runway slots at popular hubs, thus making it extremely difficult for any new carrier to obtain the gates and runway slots needed for day-to-day operation.

**c. The Defendants had Many Opportunities to Collude**

78.     Defendants had many opportunities to collude. For example, industry executives attended trade association meetings, including meetings of the IATA (as detailed above). In addition to these opportunities to meet face to face, industry executives exchanged information through stock analysts and investor calls and may have communicated directly with one another by phone or email.

**d. The Airline Industry's History of Collusive Behavior**

79.     Airlines have engaged in express coordinated behavior in the past. In the 2013 DOJ Complaint, the DOJ highlighted the fact that the "structure of the airline industry is already conducive to coordinated behavior." 2013 DOJ Complaint at ¶ 41. For example, the airlines maintain close watch over each other's fares and respond in kind to each other's fare increases.

80.     In 1992, airlines, including American and US Airways, were sued by the United States for using the Airline Tariff Publishing Company ("ATPCO") to coordinate pricing. The ATPCO has been described as a "dedicated price-telegraph network" for the airline industry. The DOJ explained in the 2013 DOJ Complaint that the airlines used the ATPCO "to monitor and analyze each other's fares and fare changes and implement strategies designed to coordinate pricing." 2013 DOJ Complaint at ¶ 44.

Specifically, the 1992 lawsuit sought to stop the airlines from "using their ATPCO filings as a signaling device to facilitate agreements on fares." *Id.* That lawsuit resulted in a consent decree, which has since expired.

81.     The 2013 DOJ Complaint also detailed other instances of anticompetitive conduct between airlines, including at least one instance of direct communication between competitors regarding pricing. Specifically, the DOJ wrote:

> US Airways also has communicated directly with a competitor when it was upset by that competitor's efforts to compete more aggressively. In 2010, one of US Airways' larger rivals extended a "triple miles" promotion that set off a market share battle among legacy carriers. The rival airline was also expanding into new markets and was rumored to be returning planes to its fleet that had been mothballed during the recession. US Airways' CEO complained about these aggressive maneuvers, stating to his senior executives that such actions were "hurting [the rival airline's] profitability – and unfortunately everyone else's." US Airways' senior management debated over email about how best to get the rival airline's attention and bring it back in line with the rest of the industry. In that email thread, US Airways' CEO urged the other executives to "portray[] these guys as idiots to Wall Street and anyone else who'll listen." Ultimately, to make sure the message was received, US Airways' CEO forwarded the email chain – and its candid discussion about how aggressive competition would be bad for the industry – directly to the CEO of the rival airline. (The rival's CEO immediately responded that it was an inappropriate communication that he was referring to his general counsel.)

*Id.* at ¶ 45.

82.     Moreover, the airlines have used "cross-market initiatives" ("CMIs") to prevent price competition. As the DOJ explained:

> A CMI occurs where two or more airlines compete against each other on multiple routes. If an airline offers discounted fares in one market, an affected competitor often responds with discounts in another market – a CMI – where the discounting airline prefers a higher fare. CMIs often cause an airline to withdraw fare discounts.

*Id.* at ¶ 43.

83.     Defendants' past willingness to violate the antitrust laws and their current ability to communicate directly or indirectly with another regarding pricing and capacity practices indicate that the industry is susceptible to collusion.

**ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT**

84.     Plaintiffs did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein prior to the 2015 comments cited in this complaint. Before Defendants' recent coordinated statements regarding "capacity discipline," it was not reasonably apparent that they were each engaged in the same practices.

85.     Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiffs and the Class members. These violations constitute injurious acts that restart the applicable statute of limitations each time they are committed.

86.     In addition, Defendants' and their co-conspirators' agreement, understanding, and conspiracy in violation of the antitrust laws was kept secret. As a result, Plaintiffs and the Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying supracompetitive prices for domestic airline tickets throughout the Class Period. Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

87.     Plaintiffs and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

88.     Neither defendants nor their co-conspirators told Plaintiffs or other Class members that they were fixing prices, or engaging in other unlawful collusive practices alleged herein. By its very nature, Defendants' and their co-conspirators' conspiracy was inherently self-concealing.

89.     On information and belief, Defendants and their co-conspirators engaged in a successful conspiracy that resulted in artificially inflated prices, which they affirmatively concealed.

**VIOLATIONS OF THE ANTITRUST LAWS**

90.     Beginning by July 14, 2011 and continuing through the present, Defendants have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of domestic airline tickets in the United States.

91.     Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of domestic airline tickets sold in the United States. These activities included:

a. Participation in meetings, conversations, and communications to discuss the price of domestic airline tickets, capacity discipline and supply restrictions;

b. Agreements during those meetings, conversations, and communications to charge prices at, to set capacity at and to restrict supply to specified levels and otherwise to fix, raise, maintain, or stabilize the price of domestic airline tickets sold in the United States; and

c. Taking numerous steps, as set forth above, to implement and maintain the conspiracy.

92.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

93.     Throughout the Class Period, Plaintiffs and the other Class members purchased domestic airline tickets directly from Defendants (or their subsidiaries or controlled affiliates) at supracompetitive prices.

94.     Defendants' contract, combination, or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, as discussed *supra*.

## ANTI-COMPETITIVE EFFECTS

95.     As a result of Defendants' unlawful conduct, Plaintiffs and other Class members have been injured in their business and property because they have paid more for domestic airline tickets than they would have paid absent Defendants' collusion.

96.     Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

a. Price competition in the market for domestic airline tickets has been artificially restrained;

b. Prices for domestic airline tickets sold by Defendants have been raised, fixed, maintained, or stabilized at supracompetitive levels; and

c. Purchasers of domestic airline tickets from Defendants have been deprived of the benefit of free and open competition in the market for domestic airline tickets.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act

97.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

98.     Beginning by at least July 14, 2011 and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, conspired to fix, raise, maintain, or stabilize prices of domestic airline tickets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

99.     Defendants entered into an agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for domestic airline tickets in the United States.

100.     Defendants entered into an agreement, understanding, and conspiracy in restraint of trade to impose capacity restrictions in furtherance of their conspiracy to fix, raise, maintain, or stabilize prices of domestic airline tickets in the United States.

101.     As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been injured in their property in that they have paid more for domestic airline tickets than they otherwise would have paid absent Defendants' misconduct. Plaintiffs and members of the Class are thus entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

102.     The alleged contract, combination or conspiracy among competitors constitutes a per se violation of the federal antitrust laws.

### PRAYER FOR RELIEF

103.     WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

a.   Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein;

b.   That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

CLASS ACTION COMPLAINT

c. That each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining and renewing the combinations, conspiracy, agreement, understanding or concert of action as alleged herein;

d. That judgment be entered for Plaintiffs and the Class members against Defendants for three times the amount of damages sustained as allowed by law;

e. That Plaintiffs and the members of the Class recover pre-judgment and post-judgment interest as permitted by law;

f. That Plaintiffs and the members of the Class recover their costs of the suit, including attorneys' fees, as provided by law;

g. For such other and further relief as is just and proper under the circumstances.

## **JURY DEMAND**

104.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims asserted in this Complaint so triable.

CLASS ACTION COMPLAINT

Dated:  September 8, 2015

BLOCK & LEVITON LLP

By: /s/ Whitney E. Street
    Whitney E. Street

BLOCK & LEVITON LLP
Whitney E. Street (State Bar No. 223870)
Lesley E. Weaver (State Bar No. 191305)
520 Third Street, Suite 108
Oakland, CA 94607
Telephone: (415) 968-8999
Facsimile:  (617) 507-6020
wstreet@blockesq.com
lweaver@blockesq.com

Erica G. Langsen
155 Federal Street
Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile:  (617) 507-6020
elangsen@blockesq.com

MORGAN & MORGAN
Peter Safirstein
Roger A. Sachar Jr.
Domenico Minerva
Morgan & Morgan
28 West 44th Street, Suite 2001
New York, NY  10036
Phone: (212) 564-1637
Facsimile: (212) 564-1656
PSafirstein@MorganSecuritiesLaw.com
RSachar@MorganSecuritiesLaw.com
DMinerva@Forthepeople.com

*Counsel for Plaintiffs*